UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAYSON VANDERVEER,

Plaintiff,

v. Case No. 25-cv-481-pp

JODI FIELDS, *et al.*,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 19), DENYING PLAINTIFF'S MOTION FOR CONSIDERATION OF NEWLY DISCOVERED EVIDENCE (DKT. NO. 34) AND DISMISSING CASE**

---

Plaintiff Jayson Vanderveer, who is incarcerated at Oshkosh Correctional Institution and is representing himself, filed this case alleging that the defendants violated his constitutional rights. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim based on allegations that the defendants denied him adequate treatment for his chronic, painful condition by discontinuing his Gabapentin medication and refusing to prescribe it for him. Dkt. No. 4 at 5. This order grants defendants' motion for summary judgment, dkt. no. 19, denies the plaintiff's motion for consideration of newly discovered evidence, dkt. no. 34, and dismisses the case.

## I. Facts[1]

The plaintiff was confined at Dodge Correctional Institution during the events described in the complaint. Dkt. No. 21 at ¶1. Defendant Jodi Fields is

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

employed by the Wisconsin Department of Corrections (DOC) as an advanced practice nurse prescriber at Dodge. Id. at ¶2. Defendant Dr. Laura Sukowaty was an associate medical director at Dodge during the events described in the complaint. Id. at ¶5. Defendant Bonnie Gugler is the health services manager at Dodge. Id. at ¶7.

Fields is an advanced care provider (ACP) with the authority to make diagnoses and referrals and prescribe medications. Id. at ¶3. ACPs are responsible for final treatment decisions, care plans, writing prescriptions, making offsite referrals and approving the treatment recommendations of offsite ACPs. Id. at ¶10. Gugler must defer to an ACP regarding appropriate medical interventions such as prescribed medications and offsite medical follow-up. Id. at ¶11. Gugler does not have the authority to override or alter a medical decision made by an ACP. Id. As a registered nurse, Gugler does not have the authority to prescribe medications or determine a plan of care related to medications used. Id. at ¶12.

A. Formulary Medications

The DOC formulary is a list of prescription and nonprescription medications ordinarily available to authorized DOC prescribers. Id. at ¶14. Formulary medications are medications that ACPs may prescribe to incarcerated individuals without prior approval. Id. at ¶16. When a drug is not on the formulary, an ACP must submit a request for non-formulary drug approval. Id. at ¶18. An ACP may consider prescribing a non-formulary medication when alternative formulary medications have been proven

ineffective or are contraindicated. Id. at ¶19. An ACP must request approval prior to prescribing a non-formulary medication, which is reviewed by the psychiatry director, medical director or associate medical director. Id. at ¶¶20-21.

B. Gabapentin Requests

Gabapentin is a non-formulary medication that is used to treat seizures, an FDA approved use, and sometimes neuropathic (nerve) pain, a non-FDA approved use. Id. at ¶23. Testing, such as electromyography (EMG), is used to determine whether a patient has neuropathy (nerve damage). Id. To prescribe Gabapentin to an incarcerated individual, an ACP must submit a non-formulary request. Id. at ¶24. The ACP uses his or her discretion to submit a non-formulary request for Gabapentin. Id. at ¶25. The ACP can use his or her medical judgment to deny an individual's request without having to get approval from the associate medical director. Id.

The criteria for an approved prescription of gabapentin within the DOC includes: the failure of first-line treatments (Tylenol, NSAIDS, amitriptyline and duloxetine), proven neuropathy by EMG, and no history of medication diversion. Id. at ¶27. Gabapentin can be problematic in a correctional setting because it has a potential for misuse and diversion. Id. at ¶28. Incarcerated individuals often divert gabapentin to others for secondary gain (for money) or are extorted for their gabapentin prescriptions. Id. Additionally, incarcerated individuals will store doses of gabapentin in order to take them at the same time to get high, or they will snort gabapentin to get high. Id. at ¶29.

Prescribing gabapentin to an incarcerated individual with a history of diverting medication poses a risk of possible addiction and abuse. Id. at ¶34. It also poses a risk to other incarcerated individuals who might receive the diverted gabapentin. Id. Finally, it could pose a security risk and thwart the institution's work in preventing medication abuse in the institution. Id. Because of the risks associated with prescribing it, gabapentin is considered a "last resort" medication and should be prescribed only when everything else has been tried and failed. Id. at ¶35.

C. Health Service Requests

When an incarcerated individual has a non-emergency medical concern, he fills out a health service request (HSR) form and submits it to the HSU drop box. Id. at ¶36. Nursing staff collect and triage HSRs daily. Id. The response will indicate whether the incarcerated individual is scheduled to be seen, referred to another staff member, referred for copies or a record review and/or whether education materials were attached. Id. The responder also may provide written comments. Id. Even though an HSR may be directed to a specific staff member, it is triaged by a nurse in the same manner. Id. at ¶39.

D. Intake Appointments at Dodge

Dodge is the central reception center for all adult male incarcerated individuals sentenced to prison in Wisconsin, and most of those individuals are not housed at Dodge long-term. Id. at ¶40. Within about twenty-four hours of admission, nursing staff complete an intake examination to identify any medical issues that may require additional attention. Id. at ¶41. During the

intake appointment, staff verify any prescription medications and provide those medications to the incarcerated individual, including non-formulary medications. Id. at ¶43.

Within a week or two of admission, an ACP will conduct a thorough physical examination. Id. at ¶44. Incarcerated individuals receive their non-formulary medication between the intake appointment and the physical examination. Id. at ¶45. This gives the ACP time to review the individual's available medical and medication records from outside facilities and previous incarcerations to determine whether it is appropriate to continue the incarcerated person on any non-formulary medications. Id.

E. Plaintiff's Relevant Medical Care

The plaintiff was housed at Dodge from November 22, 2024 to February 26, 2025. Id. at ¶46. He previously was incarcerated from November 8, 2018 to July 11, 2023. Id. On November 22, 2024, Medical Assistant Nicole Swalby and Nurse Anna Bille performed the plaintiff's intake appointment. Id. at ¶47. He reported that he took 300 mg. of gabapentin twice a day for chronic nerve pain, Ibuprofen as needed for headaches, 25 mg. of Hydrochlorothiazide once daily for hypertension, 20 mg. of Atorvastatin once daily for hyperlipidemia and Acetaminophen as needed for chronic nerve pain. Id. at ¶48. Swalby and Bille noted that the plaintiff previously was diagnosed with cocaine use disorder in 2019. Id. at ¶49. The plaintiff reported that he used marijuana daily and that his drug use interfered with his work and home life. Id. at ¶50.

The plaintiff received gabapentin between November 22 and December 4, 2024. Id. at ¶51. On December 4, 2024, Fields saw the plaintiff for his physical examination. Id. at ¶52. The plaintiff told Fields that he was in a motorcycle accident in 2012 in which he broke all the bones on the left side of his body, resulting in chronic nerve pain in his legs and left arm. Id. at ¶53. The plaintiff reported that he was taking gabapentin, Tylenol and Ibuprofen for pain. Id. at ¶54. He said his last MRI had been less than a year ago and he had never had EMG testing done. Id. at ¶55. He had physical therapy after his accident. Id. About a year and a half previously, he had tried physical therapy again to see if he could get any more mobility in his arm back, but he was told that he was now at his new baseline. Id. The plaintiff stated that aside from gabapentin, he had been on only Tramadol and Oxycodone for pain. Id. at ¶56. He reported that he had been on amitriptyline in the past for insomnia and pain and was willing to try that again. Id.

In her examination, Fields noted that the plaintiff was able to walk to her office with a steady gait and did not display any signs of pain or guarding. Id. at ¶57. Although the plaintiff was able to maintain flexion against resistance in both his upper and lower extremities, he seemed to switch that he was weaker in his right arm than his left a couple of times, but both arms were equally strong. Id. at ¶58.

Fields advised the plaintiff that she could not prescribe him gabapentin because he did not meet the criteria. Id. at ¶59. Specifically, the plaintiff had tried only Tramadol, Oxycodone and gabapentin for his pain, he had never

undergone an EMG and he had a history of substance abuse. Id. Additionally, the plaintiff had a history of medication misuse and abuse. Id. Fields restarted the plaintiff on 25 mg. of amitriptyline and ordered that he titrate up to 50 mg. after fourteen days. Id. at ¶60. Fields also started the plaintiff on Tylenol and Celebrex, an NSAID, and advised that he stop Ibuprofen. Id. Fields reviewed alternative pain management strategies with the plaintiff, including stretches, range of motion activities, increasing activity, avoiding smoking and weight control. Id. Amitriptyline, Celebrex and Tylenol all are used to treat pain or inflammation. Id. at ¶61. The plaintiff agreed to this plan. Id. at ¶63. Fields ordered that the plaintiff be seen for a follow up in three months because it takes eight to twelve weeks to feel the full benefits of amitriptyline. Id. at ¶65.

F. Plaintiff's HSRs Regarding Gabapentin

Between December 9, 2024 and when he transferred out of Dodge on February 26, 2025, the plaintiff submitted twenty-two HSRs asking to be put back on gabapentin and complaining about pain. Id. at ¶66. Fields requested that he remain on the medication she had prescribed so that it had time to take effect, and she told the plaintiff that he would have EMG testing at his placement facility. Id. at ¶67. Fields did not order EMG testing while the plaintiff was at Dodge because the testing is done at an offsite facility, and Fields did not know when he would be transferred out of Dodge or where he would be transferred to. Id. at ¶68. She did not want to have an offsite appointment scheduled only for it to be cancelled when the plaintiff transferred. Id.

The plaintiff also provided documentation that he was on disability. Id. at ¶69. The documents that the plaintiff submitted to HSU are not medical records and do not show any history of what treatment he has had for his chronic pain. Id. at ¶70.

G. Plaintiff's HSRs Directed to Gugler

On December 9, 2024, the plaintiff submitted an interview/information request directed to Gugler, stating that he was told he did not fit the criteria to stay on gabapentin. Id. at ¶71. The plaintiff said that denying him gabapentin was inhumane and he requested to be placed back on the medication. Id. The next day, Gugler responded that gabapentin is a non-formulary medication, and that alternative medications must be trialed before a non-formulary request can be considered or approved. Id. at ¶72. On December 11, 2024, the plaintiff sent Gugler an HSR stating that he already had been on alternative medications, so he should be allowed gabapentin. Id. at ¶73. Gugler responded the next day that the plaintiff needed to work with his provider. Id. at ¶74. As the HSM, Gugler cannot override medical decisions made by an ACP or change a patient's course of treatment. Id. at ¶75.

On December 28 and 31, 2024, and January 4, 2025, the plaintiff sent interview/information requests directed to Gugler stating that he needed gabapentin. Id. at ¶76. Fields responded that the plaintiff did not meet the criteria for gabapentin and that he would have further treatment done at his placement facility. Id. at ¶¶77-78. The plaintiff did not direct any further HSRs to Gugler regarding gabapentin. Id. at ¶79.

H. Plaintiff's HSRs Directed to Sukowaty

On January 1, 2025, the plaintiff sent an HSR directed to Sukowaty that stated, "I have wrote my provider H.S.U Manager and filed an inmate complaint. I am in chronic pain and no one has tryed [sic] to help me (or) cares!! I don't even get my slips back anymore. You have left me no other choice to file an (42 USC 1983) for mistreatment and violating my 8 & 14 Amendment rights. Can you send me the H.S.U Manager full name! Thank you!" Id. at ¶80. On January 6, 2025, Sukowaty responded that the plaintiff should follow up with his provider to discuss his complaints, and that he was on an alternative medication. Id. at ¶81.

On January 4, 2025, the plaintiff sent an interview/information request to Sukowaty asking what he had to do to be placed back on gabapentin. Id. at ¶82. He said that he had been on gabapentin for twenty years. Id. Sukowaty responded that she had reviewed the plaintiff's medical records back to 2019, and that he did not meet the criteria for gabapentin. Id. at ¶83. Sukowaty noted that the plaintiff had a non-formulary request for gabapentin in 2022 that was denied. Id. She advised that the plaintiff try formulary alternatives first. Id.

I. Non-formulary Request

On January 5, 2025, the plaintiff submitted two HSRs claiming that his medication did not work. Id. at ¶84. In response, Fields placed a non-formulary request for 120 tablets of Tylenol per month. Id. at ¶85. While Tylenol is a formulary medication, an ACP can prescribe only sixty tablets at one time. Id.

at ¶86. If an ACP determines that a patient needs more than that, the ACP must submit a non-formulary request. Id. Sukowaty approved the request that day. Id. at ¶87. Fields also stopped the plaintiff's amitriptyline and started him on duloxetine. Id. at ¶88.

J. January 28, 2025 Nursing Appointment

On January 28, 2025, Nurse Katy Pinch saw the plaintiff for his complaints of unmanaged pain and worsening pain when climbing to his bunk. Id. at ¶89. The plaintiff rated his pain as an eight out of ten in his back. Id. at ¶90. He said that his pain was tolerable, but that he was unable to do any recreation or activity. Id. He reported that his back hurt even when walking to HSU, so he laid or sat in a chair all day. Id. He felt that Tylenol was helpful. Id. The plaintiff told Pinch that he had only sixty tablets of Tylenol a month, so he did not have enough to last him the month. Id. at ¶91. Pinch advised the plaintiff that the order was for 120 tablets a month. Id. at ¶92. The plaintiff was pleased to know that he could take Tylenol twice a day without running out early in the month. Id.

Pinch initiated a functional observation for a low bunk request. Id. at ¶93. This is where a security staff member observes the incarcerated individual and records his activities and functions. Id. A security staff member recorded that the plaintiff was a unit "swamper" (a custodial position), and he was observed walking up and down stairs multiple times a day with trays. Id. at ¶94. Therefore, there was no medical necessity for a low bunk restriction. Id.

K. <u>Conclusion</u>

On February 26, 2025, the plaintiff transferred to Oshkosh. <u>Id.</u> at ¶95. In Fields's review of the plaintiff's medical chart, providers at Oshkosh have not prescribed him gabapentin. <u>Id.</u>

The plaintiff alleges that Fields was still refusing him gabapentin after he tried first-line medication. <u>Id.</u> at ¶96. This is not true; it takes time for a medication regimen to take effect. <u>Id.</u> After a month of the plaintiff complaining that amitriptyline was not working, Fields switched him to duloxetine and upped his Tylenol. <u>Id.</u> The plaintiff may perceive this as Fields denying him care, but he must try first-line treatments before he can be considered for gabapentin. <u>Id.</u> at ¶97. The criteria are the same for all incarcerated individuals. <u>Id.</u> Fields based her decision not to prescribe the plaintiff gabapentin on his medical history and her physical examination of him. <u>Id.</u> at ¶98.

Fields did not submit a non-formulary request for gabapentin for the plaintiff. <u>Id.</u> at ¶99. Therefore, Sukowaty was not involved in denying the plaintiff gabapentin. <u>Id.</u> Sukowaty agrees with Fields's decision not to prescribe gabapentin, because the plaintiff did not have a documented history of trying other medications. <u>Id.</u> at ¶100. Additionally, the plaintiff agreed to try amitriptyline again. <u>Id.</u> Aside from answering some of his HSRs and approving Fields's non-formulary request, Sukowaty was not otherwise involved in treating the plaintiff. <u>Id.</u> at ¶101. Aside from answering some of his HSRs, Gugler was not involved in the plaintiff's care. <u>Id.</u> at ¶102.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendants contend that Fields is entitled to summary judgment because the plaintiff's undisputed medical records demonstrate that he received appropriate medical treatment and that Fields did not disregard his medical condition. Dkt. No. 20 at 15-19. In the alternative, the defendants contend that Fields is entitled to qualified immunity. Id. at 19-21. They also contend that Sukowaty and Gugler are entitled to summary judgment because there is no evidence to suggest that either played any role in deciding what medications the plaintiff was prescribed. Id. at 21-22.

The plaintiff responds that Fields is not entitled to summary judgment because the record shows that the plaintiff received inappropriate medical treatment. Dkt. No. 29 at 9. He asserts that he has shown that the defendants did not use their professional judgment because other incarcerated individuals have filed civil rights cases alleging that they denied them gabapentin.[2] Id. at

[2] The plaintiff cites to Green v. Wienmann, Case No. 23-cv-136, 2023 WL 3344450, *2 (E.D. Wis. May 10, 2023) (incarcerated individual stated Eighth Amendment claim against Fields based on allegations that she failed to address his persistent complaints of increasing pain over a several month period); Tombs v. Fields, Case No. 19-cv-1164, 2021 WL 2138864, *4 (E.D. Wis. May 26, 2021) (reasonable factfinder could not conclude that Fields was deliberately indifferent toward incarcerated individual's medical condition by prescribing him medication (Duloxetine) to which he had an allergic reaction); Scott v. Brown, Case No. 24-cv-103, 2025 WL2322394, **3-6 (W.D. Wis. Aug. 12, 2025) (reasonable factfinder could not conclude that Sukowaty consciously disregarded incarcerated individual's need for medication to treat his chronic nerve pain by discontinuing his gabapentin and not providing alternative pain medication); McCorkle v. Dodge Corr. Inst., Case No. 24-cv-605, 2024 WL 4903980, *3 (W.D. Wis. Nov. 27, 2024) (incarcerated individual did not state claim against Fields and Kasten for denying request to go to hospital, delaying medical care and denying wheelchair restriction after he fell from top bunk and injured back); and Whitcomb v. Sukowaty, Case No. 23-cv-385, 2024 WL

11. He states that this shows that Fields acted maliciously in discontinuing his gabapentin, and that she disregarded his medical condition and treatment. Id. The plaintiff asserts that the other medications the defendants tried did not work and that the defendants knew they wouldn't work. Id. at 13. He states that the defendants "are engaged in a web of discontinuing inmates['] medications like Gabapentin when they enter Dodge, this is quite clear by the multiple litigations against these defendants." Id. The plaintiff contends that Fields violated his constitutional rights when he was already prescribed gabapentin and she forced him to go through a trial of medications that did not work. Id. at 13-14. He also contends that Sukowaty and Gugler are not entitled to summary judgment because they are supervisors and turned a blind eye to Fields's actions.[3] Id. at 14-15.

---

52384465, at *9-*10 (E.D. Wis. Dec. 27, 2024) (Sukowaty entitled to summary judgment on claim that she unreasonably delayed hernia surgery). Dkt. No. 29 at 2.

[3] The defendants filed a reply, dkt. no. 32, and the plaintiff filed a sur-reply, dkt. no. 33. The court's Local Rules do not provide for sur-replies and the plaintiff did not file a motion asking permission to file a sur-reply. The plaintiff does not allege, and the court does not find, that the defendants have proposed new material facts or evidence in their reply brief that would warrant a sur-reply. See Slaughter v. Lutsey, Case No. 17-cv-1448, 2019 WL 11502919, at *1 (E.D. Wis. June 14, 2019), aff'd, 805 F. App'x 424 (7th Cir. 2020). The court will not consider the plaintiff's sur-reply. On May 20, 2026, about two weeks after the plaintiff filed his sur-reply, he filed a motion for consideration of newly discovered evidence under Fed. R. Civ. P. 56(f). Dkt. No. 34. He states that on March 4, 2026, he submitted an open records request for video footage from Dodge's HSU on December 4, 2024. Id. at 1. The plaintiff states that the footage would show that he did not enter the HSU that day like the defendants say he did, that is, walking with a steady gait and not displaying signs of pain. Id. The plaintiff does not say how he walked into the HSU that day, although presumably he means to say that he walked slowly and painfully. In any event, the way Fields observed the plaintiff walk into the HSU is not relevant to the

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody." Sanders v. Moss, 153 F.4th 557, 567 (7th Cir. 2025) (quoting Dean v. Wexford Health Sources, Inc., 18 F.4th 214, 234 (7th Cir. 2021)); see also Estelle v. Gamble, 429 U.S. 97, 102 (1976). A prison official's "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. Sanders, 153 F.4th at 567 (quoting Estelle, 429 U.S. at 104). The plaintiff must satisfy two prongs to prove a deliberate indifference claim. First, he must show that he suffers from an "objectively serious medical condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*)). The plaintiff also must establish that the prison official acted with a "sufficiently culpable state of mind." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see also Wilson v. Seiter, 501 U.S. 294, 297 (1991). "A prison official has a sufficiently culpable state of mind when the official 'knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk.'" Sanders, 153 F.4th at 568 (quoting Farmer, 511 U.S. at 834). The defendants do not argue that the plaintiff did not have a serious medical need. The court will focus on whether a reasonable factfinder could conclude that the defendants acted with deliberate indifference.

"The standard to prove deliberate indifference is a difficult one: a medical professional's treatment decision 'must be such a substantial departure from

---

court's analysis in resolving the defendants' motion for summary judgment. The court will deny the plaintiff's motion for consideration of newly discovered evidence.

accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" Id. (quoting Petties, 836 F.3d at 728-29). The plaintiff asserts that Fields maliciously discontinued his gabapentin and that she knew that the alternative medications she prescribed wouldn't work. The record does not support the plaintiff's assertions.

It is undisputed that when the plaintiff entered Dodge on November 22, 2024, he reported suffering from chronic nerve pain stemming from severe injuries he suffered in 2012 and that he took gabapentin for his nerve pain. The plaintiff also reported that he had been treated for "cocaine use disorder" in 2019 and that he was a daily marijuana user. At Fields's physical examination of the plaintiff on December 4, 2024, she told him that she couldn't prescribe him gabapentin because he did not meet the DOC's criteria for receiving that non-formulary medication—failure of first-line treatments (Tylenol, NSAIDS, amitriptyline, duloxetine), proven neuropathy by EMG, and no history of medication diversion. The plaintiff did not meet that criteria because he had tried only tramadol, oxycodone and gabapentin for pain, he never had undergone an EMG and he had a history of substance abuse as well as medication misuse and abuse. Fields prescribed the plaintiff amitriptyline, Tylenol and Celebrex, and she reviewed pain management strategies with him. The plaintiff agreed to the plan. Fields ordered that the plaintiff be seen for a follow up in three months because it takes eight to twelve weeks to feel the full benefits of amitriptyline.

The plaintiff started submitting HSRs almost immediately, asking to be placed back on gabapentin and stating that he was in pain. The plaintiff was repeatedly told that he would not be prescribed gabapentin, he was encouraged to give his new medication time to work on his chronic pain and he was told that he would have an EMG at his next institution. About one month after the plaintiff's physical examination with Fields, he submitted two HSRs stating that his medication still was not working. In response, Fields submitted a non-formulary request to increase his Tylenol to 120 tablets per month, which Sukowaty approved. Fields also increased the plaintiff's Celebrex dosage, stopped amitriptyline and started the plaintiff on duloxetine for his pain. The plaintiff had an appointment with a nurse on January 28, 2025, in which he said his pain was eight out of ten, described his pain as tolerable and said that the Tylenol helped. At this appointment, he asked for a lower bunk but that request was denied after staff observed the plaintiff engaged in his prison swamper job. The plaintiff complained on February 9, 2025 that the duloxetine did not help his nerve pain. On February 26, 2025, he transferred to a different institution.

"A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." Sanders, 153 F.4th at 568 (quoting Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021)). "[T]he Eighth Amendment does not entitle incarcerated patients to their preferred pain medication," and "it does not impose the unrealistic requirement that doctors

keep their patients completely pain-free[.]" Arce v. Wexford Health Sources Inc., 75 F.4th 673, 681 (7th Cir. 2023) (quoting Arnett, 658 F.3d at 753-54; Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)). The plaintiff has not submitted evidence to support his assertion that Fields did not exercise professional judgment in discontinuing his gabapentin or that she persisted in an ineffective course of treatment when he reported that he was still experiencing pain. Rather, the record shows that Fields conducted a thorough examination that included a determination that the plaintiff did not meet the criteria for gabapentin. Fields prescribed the plaintiff alternative pain medications along with recommendations to manage his chronic pain. When the plaintiff consistently reported that the amitriptyline wasn't working, Fields prescribed a different medication (duloxetine), increased Celebrex and made a non-formulary request for more Tylenol. The plaintiff's disagreement with Fields's treatment decision is not evidence of deliberate indifference. See Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014); Snipes, 95 F.3d at 591. Fields did not act with deliberate indifference by not prescribing gabapentin for the plaintiff.

The plaintiff claims that Sukowaty and Gugler "turned a blind eye" to Fields's refusal to prescribe him gabapentin. Because the court has concluded that the plaintiff has no constitutional claim against Fields, he cannot maintain a claim against Sukowaty and Gugler for violating his constitutional rights. In any event, as a nurse, Gugler did not have the authority to prescribe medication and therefore she could not be liable for failing do so. A defendant

cannot be liable under §1983 "if the remedial step was not within [her] power." See Miller v. Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012).

As associate medical director, Sukowaty was not directly involved in the plaintiff's care. She did respond to two of the plaintiff's HSRs. In response to the plaintiff's January 1, 2025 HSR, she encouraged him to follow up with his provider to discuss his complaints. Three days later, Sukowaty responded to the plaintiff's request to be placed back on gabapentin. She responded that she had reviewed the plaintiff's medical records back to 2019 and he did not meet the criteria for gabapentin. Sukowaty noted that the plaintiff had a non-formulary request for gabapentin in 2022 that was denied, and she again advised him to try formulary alternatives first. (Within a day or so of the plaintiff's second request, his medication was changed by increasing Celebrex and Tylenol, and substituting duloxetine for amitriptyline, but there is no indication that Sukowaty had any involvement in the medication change.) Sukowaty, who was not the plaintiff's medical care provider, responded to the plaintiff's requests by advising him to work with his provider and try non-formulary medications for his chronic pain. She did not act with deliberate indifference to the plaintiff's serious medical needs. See Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009) (public employees are responsible for their own misdeeds but not for anyone else's).

A reasonable factfinder could not conclude that the defendants violated the plaintiff's constitutional rights. The court will grant the defendants' motion for summary judgment and dismiss the case.[4]

**III. Conclusion**

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 19.

The court **DENIES** the plaintiff's motion for consideration of newly discovered evidence. Dkt. No. 34.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If

[4] Because the defendants are entitled to summary judgment on the merits, the court will not address the defendants' contention that they are entitled to qualified immunity.

the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 15th day of September, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**